UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| DORAN A. SCHMITT, AS SPECIAL ADMINISTRATOR OF THE ESTATE OF DANIEL ERIC SCHMITT;<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | 5:13-CV-05066-JLV<br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

This is an action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671 *et seq.*, to recover damages arising from the death of Daniel Schmitt (Schmitt). The complaint was filed against the United States by Doran Schmitt, wife of the deceased and Special Administrator of his estate. The plaintiff alleges that Schmitt died while under arrest as a result of the arresting officers' negligence. The United States has moved to dismiss this case for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted pursuant to the Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively. In the alternative, the United States moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The government has argued, among other defenses, that this Court lacks subject matter jurisdiction because the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a),

1

applies. Because it is the Court's recommendation that the 12(b)(1) motion to dismiss be granted for lack of subject matter jurisdiction, the other defenses will not be considered herein.

## **MATERIAL FACTS**

The following facts are undisputed. On September 4, 2010, Schmitt arrived at Gaden's Point, Orman Dam, Belle Fourche Reservoir, in South Dakota, to camp with his girlfriend, Cara Blake Willson and her family. (Doc. 22, ¶1, 14). Orman Dam is a summer recreation site located on United States Department of the Interior, Bureau of Reclamation (BOR) land. (Doc. 22, ¶ 3). A Memorandum of Understanding (MOU) between the BOR and Bureau of Land Management (BLM) gives the BLM officers authority to enforce laws on BOR land. (Doc. 22, ¶4). Rocky Point State Park is located at Orman Reservoir (Doc 27, p. 60).

On September 5, 2010, BLM Ranger Charles Huston (Ranger Huston) and South Dakota Conservation Officer William Eastman (CO Eastman) patrolled Orman Dam until about 6:00 p.m. (Doc. 22, ¶5). At approximately 7:00 p.m. the same day, the Butte County Sheriff's Office received a 911 call reporting that Schmitt was intoxicated and trying to fight other campers at Orman Dam. (Doc. 22, ¶6). Butte County Dispatch called Ranger Huston at home to inform him about the 911 call. Ranger Huston then called CO Eastman, at his home, and asked him to accompany him back to Orman Dam. (Doc. 22, ¶7). Ranger Huston picked up CO Eastman in a BLM marked patrol vehicle, and they traveled to Orman Dam. (Doc. 22, ¶8). The vehicle was a

2009 Ford 4-door F-150 pickup truck equipped with law enforcement emblems on the doors, light bar, siren, radio, and a single prisoner cage located in the right rear passenger area. (Doc. 22, ¶ 9).

Butte County dispatched Sheriff Deputy Curt Nulles (Deputy Nulles) to Orman Dam. Deputy Nulles was the first to arrive. He located Schmitt and brought him to the entrance of Rocky Point State Park. (Doc. 22, ¶10). At some point, Ranger Huston requested Butte County Sheriff's Deputy Doug Parrow's assistance. (Doc. 22, ¶ 11). Ranger Huston, CO Eastman and Deputy Parrow met Deputy Nulles at the entrance of Rocky Point State Park (Doc. 22, ¶ 11). Schmitt stated that he had been in a boating accident and could not find his girlfriend. (Doc. 22, ¶12). The officers traveled with Schmitt to Middle Point, at Orman Dam, the location of the 911 reporting party and the rest of the family with whom Schmitt was camping. (Doc. 22, ¶14). Ranger Huston located Blake Willson (Schmitt's girlfriend) and Cara Willson (Blake's mother). One of them told Ranger Huston that Schmitt had not been on their boat, but he had been drinking. (Doc. 22, ¶14). Ranger Huston took statements and learned that Schmitt had been drinking beer and "cactus juice," which was determined to be a brand of tequila. (Doc. 22, ¶15). Schmitt had assaulted Robert Willson, Blake's father, and taken swings at Cara. (Doc. 22, ¶ 16). Cara stated that they did not want Schmitt around for the rest of the night because he would continue to cause problems. (Doc. 22, ¶16). Ranger Huston felt he could not leave Schmitt at Orman Dam because he was a danger to himself and others. (Doc. 35, ¶ 70).

Ranger Huston arrested Schmitt for disorderly conduct, placed him in hand cuffs behind his back, searched him, and placed him in the BLM vehicle's passenger cage. (Doc. 22, ¶17). Ranger Huston then secured the seat belt, heard the seat belt click, and pulled up on the seatbelt. The seatbelt did not come free. He hit the lock button on the door, shut the door, and grabbed the handle. The door did not open from the outside. (Doc. 22, ¶ 17). CO Eastman watched Ranger Huston double lock the handcuffs, run his finger along the edge to make sure the handcuffs were not too tight, search Schmitt, place him in the prisoner cage unit, fasten the seatbelt, manually lock and close the door. (Doc. 22, ¶ 18).

Ranger Huston asked CO Eastman to drive the BLM vehicle to the Pennington County jail, in Rapid City, South Dakota, approximately 60 miles on gravel and asphalt roads, so that he could complete the paperwork on the way to the jail. (Doc. 22, ¶ 20). CO Eastman drove and Ranger Huston sat in the front passenger seat of the BLM vehicle. (Doc. 22, ¶ 21). The prisoner cage did not have a light on. The only lights on in the vehicle were the dash lights and a light attached to Ranger Huston's visor that he turned on to complete the paperwork. (Doc. 22, ¶22). CO Eastman could occasionally see the outline of Schmitt's head. (Doc. 22, ¶22). Ranger Huston asked Schmitt on several occasions if he was okay. CO Eastman also asked Schmitt if he was okay. Each time they asked, Schmitt gave a positive response. (Doc. 22, ¶25). Once they left Orman Dam, Schmitt talked about the military and his involvement in it, the fine amount for his arrest and what was going to happen post-arrest. (Doc.

22, ¶27-28). While driving, Ranger Huston stopped at a stop sign at the intersection of Crooked Oaks Road and Highway 34 at Saint Onge, South Dakota. At the intersection, Ranger Huston asked Schmitt if he was "doing okay" and Schmitt responded affirmatively. (Doc. 22, ¶32).

As CO Eastman began to accelerate to drive south on Highway 34 and he heard a clanging noise in the backseat and movement that had not occurred throughout the rest of the trip. (Doc. 22, ¶33). At that time, CO Eastman did not know how fast he was driving, but he took his foot off the accelerator and applied the brake. (Doc. 22, ¶35).

CO Eastman and Ranger Huston heard that the rear passenger door was not closed securely from the sound of air and the tire on the ground. (Doc. 22, ¶36, 38). CO Eastman then came to a complete stop. (Doc. 22, ¶37). Both CO Eastman and Ranger Huston found Schmitt unconscious and lying face down on the shoulder of the road with his hands still cuffed behind his back. (Doc. 22, ¶40). Ranger Huston removed the cuffs, called for an ambulance, and attempted to reduce the bleeding from Schmitt's head. (Doc. 22, ¶41-43). Schmitt died from head injuries after he was transported to the hospital. (Doc. 22, ¶47). A toxicology report showed his Blood Alcohol Concentration was .121 gm/dL at the time of his death. (Doc. 22, ¶ 48). The child safety lock on the rear passenger door of the vehicle was in the unlocked position. (Doc. 40-14, p. 4).

In their review, the Bureau of Land Management reported that there was "no policy on disabling interior door handles in prisoner transport cages at the

time of" Schmitt's transport and death. (Doc. 40-14 at p. 8). BLM determined that child locks are sufficient for stopping children from opening doors, but not adults and established a policy for disabling the interior door handles for prisoner transportation. (Doc. 40-14, p. 8). BLM found that Ranger Huston acted appropriately in following the guidelines for securing Schmitt for transport. (Doc. 40-14, pp. 5-6, 9). BLM also found that Ranger Huston was in compliance with policy when he asked CO Eastman drive the LEO vehicle so he could complete his report during transport. (Doc. 40-14, p.6).

## DISCUSSION

### RULE 12(b)(1) STANDARD

This Court must first determine the applicable standard of review governing the pending motion. The United States has moved to dismiss this case for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted pursuant to the Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively. In the alternative, the United States asserts the Court should grant summary judgment pursuant to Federal Rule of Civil Procedure 56.

A court has "broader power to decide its own right to hear the case than it has when the merits of the case are reached." Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990). Jurisdiction is a "threshold question" and "judicial economy demands that the issue be decided at the outset rather than deferring it until trial, as would occur with denial of a summary judgment motion." Whalen v. United States, 29 F.Supp.2d 1093, 1095 (D.S.D. 1998).

This Court may consider materials outside of the pleadings in considering subject matter jurisdiction under Rule 12(b)(1). Osborn, 918 F.2d at FN 4. (citing Land v. Dollar, 330 U.S. 731, 735 & n. 4 (1947); Satz v. ITT Fin. Corp., 619 F.2d 738, 742 (8th Cir. 1980)). Considering outside materials will not convert a 12(b)(1) motion to one for summary judgment. Osborn, 918 F.2d at 729.

When a court decides a motion under 12(b)(1), it must distinguish between a "facial attack" and a "factual attack." Id. (citing Menchaca v. Chrysler Credit Corp., 613 F.2d, 507, 511 (5th Cir. 1980); Mortensen v. First Federal Sav. And Loan Ass'n, 549 F.2d 884, 891 (3rd Cir. 1977)). In a facial attack, the court considers only the complaint and decides whether the "plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." Menchaca, 613 F.2d at 511. In contrast, a factual attack challenges the "existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." Id. The plaintiff bears the burden to show that the court has jurisdiction. Id. No presumption of truthfulness attaches to the plaintiff's allegations in the complaint. Mortensen, 549 F.2d at 891. The existence of disputed material facts does not prevent the court from evaluating and reaching a decision on the merits of the jurisdictional claim. Id.

An exception to this ability of the court to consider outside information when evaluating the jurisdictional claim, is if "a jurisdictional issue is so bound

7

up with the merits that a full trial on the merits may be necessary to resolve the issue...." Whalen, 29 F.Supp.2d at 1095 (D.S.D. 1998). In that case, "a court should not consider information outside the pleadings on a motion to dismiss pursuant to Rule 12(b)(1)." Id. However, if a jurisdictional issue is clearly severable from the merits of the negligence claim, then it may consider outside information. See Osborn, 918 F.2d at 730 (8th Cir. 1990) ("the statute of limitations inquiry [a jurisdictional inquiry] is clearly severable from the merits of the Osborns' [negligence] claim"); Whalen, 29 F.Supp.2d at 1095 (whether the National Park Service had discretion to not implement certain safety precautions was separate from the plaintiff's negligence claim). If the jurisdictional and substantive issue are severable, the court may decide the jurisdictional issue. See id.

The defendant presented a factual attack on the complaint challenging the existence of subject matter jurisdiction. The BLM policy materials that were provided for the Court to consider are necessary in making this jurisdictional determination. Similar to Osborn and Whalen, the jurisdictional issue is not inextricably bound up with the merits of the substantive claim. Jurisdiction is clearly severable from the negligence claim. With the foregoing standard in mind, the Court now turns to the government's motion to dismiss pursuant to Rule 12(b)(1).

### A. **WHETHER THE DISCRETIONARY FUNCTION EXCEPTION APPLIES**

Plaintiff's assertion of liability against the government is premised on the Federal Torts Claim Act (FTCA), 28 U.S.C. §§ 1346(b), and 2671 *et. seq.* The

8

United States, as a sovereign, is immune from suit, except to the extent of its consent. United States v. Mitchell, 463 U.S. 206, 212 (1983); Dykstra v. United States, 140 F.3d 791, 795 (8th Cir. 1998). Under the FTCA, the government enacted a limited waiver of its own sovereignty for certain negligent acts of its employees carried out in the course and scope of their employment with the government. United States v. Orleans, 425 U.S. 807, 813 (1976).

The terms of the FTCA expressly define the limits of a district court's subject matter jurisdiction. United States v. Orleans, 425 U.S. 807, 813-14 (1976); Johnson v. United States, 534 F.3d 958 (8th Cir. 2008). "The threshold inquiry in every federal case is whether the court has jurisdiction" and the Eighth Circuit has "admonished district judges to be attentive to a satisfaction of jurisdictional requirements in all cases." Rock Island Millwork Co. v. Udges-Gough Lumber Co., 337 F.2d 24, 26-28 (8th Cir. 1964); Sanders v. Clemco Industries, 823 F.2d 214, 216 (8th Cir. 1987).

The FTCA confers exclusive jurisdiction upon district courts over civil actions for money damages caused by the negligent or wrongful act or omission of any federal employee acting within the scope of his employment. 28 U.S.C. §§ 1346(b) and 2674. This waiver of immunity is limited, however, by the "discretionary function" exception; that is, the government is not liable for claims based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused. 28 U.S.C. § 2680(a). Where the discretionary function exception applies, the

9

court lacks subject matter jurisdiction. Jurzec v. American Motors Corp., 856 F.2d 1116, 1118 (8th Cir. 1988); Whalen, 29 F. Supp. at 1096. The exception covers all discretionary acts, even if the act is negligently performed or involves an abuse of discretion. Dalehite v. United States, 346 U.S. 15 (1953).

The purpose of the discretionary function exception is to prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. United States v. Gaubert, 499 U.S. 315, 323 (1991) (quoting United States v. Varig Airlines, 467 U.S. 797, 814 (1984)). This is essential, as courts are not equipped to investigate and weigh factors which enter into the administrative decision making process. Payton v. United States, 679 F.2d 475, 487 (5th Cir. 1982). The exception also applies without regard to the kind of employee charged with a breach of duty or failure to perform a discretionary function. Gaubert, 499 U.S. at 325. The Eighth Circuit had not yet taken a formal position on who bears the burden of persuasion as to whether the discretionary function exception applies. Hart v. United States, 630 F.3d 1085, ftn3 (8th Cir. 2011)(stating in dicta that the general rule is that the burden of proving federal jurisdiction is on the party seeking to establish it).

In United States v. Varig Airlines, 467 U.S. 797, 813 (1984), the Supreme Court established a two-part test to determine whether the discretionary function applies in a particular case. It has applied this two tiered analysis in subsequent cases. See Berkovitz v. United States, 486 U.S. 531 (1988); United States v. Gaubert, 499 U.S. 315 (1991). First, a court must inquire whether the

10

governmental action complained of "involves an element of judgment or choice." Berkovitz, 486 U.S. at 537; Gaubert, 499 U.S. at 232. If it does, then the court must decide whether the choice or judgment is one based on considerations of public policy. Berkovitz, 486 U.S. at 537; Gaubert, 499 U.S. at 232.

### 1.   Whether Ranger Huston's Actions Were Discretionary

Under the exception's first tier, a court must determine if the actions taken are discretionary in nature, that is, whether they involve an element of choice. Berkovitz, 486 U.S. at 536; Dykstra, 140 F.3d at 795. "The discretionary function exception will not apply when a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow" and leaves the employee "no rightful option but to adhere to the directive." Berkovitz, 486 U.S. at 536. Therefore, the court must determine whether the challenged act or omission violated a mandatory regulation or policy that allowed no other option. Where a plaintiff contends that the discretionary function exception is inapplicable because a federal employee violated mandatory directives, it is the plaintiff's burden to identify with specificity what mandatory statutes, regulations or directives have allegedly been violated. Whalen, 29 F.Supp.2d at 1096 ¶11 (D.S.D. 1998); Val-U Const. Co. of South Dakota, Inc., v. United States, 905 F.Supp 728, 736 ¶16 (D.S.D. 1995).

Plaintiff's first argument against the discretionary function exception is that Ranger Huston failed to use the child safety lock that came standard with

11

the vehicle he was assigned. The BLM manual provides law enforcement general direction for the treatment regarding arrestees. For example, "[a]n LEO…is responsible for the proper safeguarding and protection of [arrestees]…." (Doc. 40-11, ¶C). The list of arrest procedures discusses handcuffing, searching, and transportation. (Doc. 40-9). The list does not include use of child safety locks. It is clear that Ranger Huston had complete discretion over whether to use the child safety locks.

The discretionary function exception applies in cases where there is no policy addressing a particular issue. See Hinsley v. Standing Rock Child Protective Services, 516 F.3d 668 (8th Cir. 2008). In Hinsley the court determined that the discretionary function applied to Child Protective Services' (CPS) failure to warn a woman that her half-brother had a history of molesting children who, after moving in with her, sexually assaulted one of her children. CPS was well aware of the half-brother's history of sexual assault. But, the court found no "statute, policy, or regulation mandating the Standing Rock CPS to warn the public or a third-party about the sexually abusive proclivities of a person who is being discharged from the CPS, nor has [the plaintiff] alerted us to such a mandate." That lack of policy and evident element of choice led the court to find that the first part of the analysis was satisfied. Here, like the Hinsley case, no statute, policy or regulation mandated Huston's use of the child safety locks. Plaintiff's argument fails.

Plaintiff's second argument is that Ranger Huston was required to check his vehicle after it was serviced and he had a habit of activating the child safety

12

locks at that time. (Doc. 34, p. 13). BLM policy states: "BLM LEOs must keep their assigned vehicles reasonably clean. Vehicles must be refueled and given a daily inspection at the start and end of each shift to ensure vehicle and equipment readiness for response to emergency situations." (Doc. 40-13, ¶E). However, if there was no policy for the use of child safety locks, the policy cannot be referring to engaging child safety locks as part of the inspection and equipment readiness. Moreover, Ranger Huston's own habit is not synonymous with an agency mandate. Plaintiff fails to cite any authority for the proposition that past discretionary conduct creates a specific directive, policy or regulation which mandates future behavior. Thus, Ranger Huston maintained discretion over the use of the child safety locks and Plaintiff's second argument fails.

Plaintiff's third argument is that the BLM policy was violated when CO Eastman drove Ranger Huston's vehicle to transport Schmitt to the jail. Plaintiff cites to the a policy in the BLM manual which states:

> **IV. Policy**
> General policy on the use of motor vehicles may be found in BLM Manual 1525.9
> -Official use of Aircraft and Motor Vehicles. **All law enforcement vehicles will be operated only by law enforcement *personnel* except for vehicle service or maintenance personnel.** Vehicles assigned to **BLM law enforcement *officers* (LEOs)** for law enforcement use will be Interior-owned vehicles only. GSA-leased vehicles are not to be used for routine law enforcement applications.

(Doc. 40-13, p.1)(emphasis added).

Plaintiff argues that this policy mandates a specific course of action, in which there is no discretion. Plaintiff argues that the policy mandates that all BLM vehicles will be operated by BLM law enforcement officers (LEO). (Doc.

13

34, p. 11). Plaintiff is incorrect. The above policy does not mandate the BLM vehicle be driven by a BLM law enforcement *officer* (LEO). Instead, the policy states that the vehicle will be driven by law enforcement *personnel*. In the Glossary of the BLM manual, the following provision is relevant:

> **III. Glossary**
> 
> -LM-
> 
> Law Enforcement Officer (LEO): Employees of the BLM who have been individually delegated law enforcement authority by the Director to enforce all Federal laws and regulations pertaining to the use, management, and development of the public lands and their resources.

(Doc. 40-10) p.1-2). The Glossary does not define the term "law enforcement personnel."

CO Eastman is a conservation officer with the South Dakota Game Fish and Parks. He underwent a minimum of eight weeks of training at the State Law Enforcement Academy. (Doc. 38-4, p.2). CO Eastman and Ranger Huston typically will meet up during the work day and patrol together. (Doc. 27, p.60). During an administrative review, the reviewing agency addressed and decided the following issue:

> **5. Issue:**
> Does BLM have policy on other law enforcement agencies driving BLM law enforcement vehicles?
> 
> **Analysis:** General Order 17, Vehicles, IV, policy states all law enforcement vehicles will be operated by law enforcement personnel except for vehicle service or maintenance personnel. Ranger [name redacted] had Officer [name redacted] of South Dakota Game, Parks and Fish driving the patrol vehicle when this incident occurred. The Board studied the circumstances of why Officer [name redacted] was driving the vehicle. Ranger [name redacted] had to complete the needed paperwork on Schmitt to process

> him into the county jail in Rapid City, South Dakota. The Board discussed this was the most efficient way to transport Schmitt and complete the required paperwork. It would have been unsafe to have [name redacted] attempt to complete the paperwork while driving or if [name redacted] would have done the paperwork at the scene. Schmitt needed to be removed from the scene and transported in a prompt fashion.
>
> **Conclusion:** The Board finds [name redacted] in compliance with General Order 17, *Vehicles*, with having Office [name redacted] drive his BLM law enforcement vehicle.

(Doc. 40-14, pp.6-7). The agency's finding is consistent with the court's conclusion that Ranger Huston had the discretion to determine whether he or other law enforcement personnel, to-wit: CO Eastman, should drive his BLM law enforcement vehicle. As the Eighth Circuit has noted, "We recognize that when a government agency has administrative authority over a regulation or procedure, we are obliged to accord great deference to the agency's reasonable interpretation thereof." Appley Bros. v. United States, 164 F.3d 1164, 1172-73 (8th Cir. 1999)(citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Ranger Huston did not violate any mandatory directive because he had the discretion to allow other law enforcement personnel to drive his vehicle while Ranger Huston processed paperwork in the front passenger seat.

### 2. Whether Ranger Huston's Choice or Judgment was Based on Considerations of Public Policy

If no federal mandate is established and the conduct in question is discretionary, then the second prong of the test requires that the plaintiff demonstrate that the challenged conduct is not "the kind that the discretionary

15

function exception was designed to shield." Gaubert, 499 U.S. at 323. The second prong works to protect "only governmental actions and decisions based on considerations of public policy." Id. Judgment calls which involve public policy considerations meet the second prong of the test even if the employee making the particular decision did not consciously consider policy factors. Tonelli v. United States, 60 F.3d 492 (8th Cir. 1995). "[W]hen governmental policy permits the exercise of discretion, it is presumed that the acts are grounded in policy." Whalen v. United States, 29 F.Supp.2d 1093, 1098 (D.S.D. 1998) (citing Chantal v. United States, 104 F.3d 207, 212 (8th Cir. 1997)). In Dalehite, the Court broadly held that "[w]here there is room for policy judgment and decision, there is discretion that the United States may exercise or even abuse without incurring tort liability." 346 U.S. at 36. Although the Court has not rigidly specified what constitutes "policy judgment," it has emphasized that the discretionary function exception protects "decisions grounded in social, economic, and political policy." Varig Airlines, 467 U.S. at 814.

Plaintiff argues that Ranger Huston's actions are not immunized by the discretionary function exception because they are not grounded in considerations of public policy. (Doc. 34, p.14-17). Given the presumption that the discretion exercised was grounded in policy, the plaintiff must provide facts to rebut this presumption. See Whalen, 29 F. Supp.2d at 1098(citing Chantel v. United States, 104 F.3d 207, 212 (8th Cir. 1997)).

In rebutting the presumption, plaintiff argues that Ranger Huston's failure to check the locks as he usually did and the failure to engage the child

16

safety lock was not based on public policy considerations. (Doc. 34, p. 16). Plaintiff fails to cite any law supporting her position that Ranger Huston's failure to check or activate the child safety lock rebuts the presumption.

In Hart v. United States, 630 F.3d 1085 (8th Cir. 2011), the Eighth Circuit considered a case similar to the facts at hand. In Hart, a warrant was issued for the arrest of Kenneth Block, who was indicted for sexual abuse of a minor. 630 F.2d at 1086. A BIA agent went to Block's house to arrest him. Id. at 1087. Block requested that he be allowed to enter his home to clean his room prior to being taken into custody. Id. The BIA agent allowed Block to go to his room, wherein Block committed suicide. Id. Block's mother sued under the FTCA asserting that the BIA officer failed to adequately supervise, secure, and detain her son, Kenneth Block. Id. at 1086. After finding the first tier inquiry had been met (BIA handbook afforded discretion in how to arrest), the Eighth Circuit recognized the agent's acts were grounded in public policy when exercising that discretion. The Court stated, "We readily conclude a federal law enforcement officer's on-the-spot decisions concerning how to effectuate an arrest—including how best to restrain, supervise, control or trust an arrestee—fall within the discretionary function exception to the FTCA absent a specific mandatory directive to the contrary. . . Such decisions are quintessential examples of the permissible exercise of policy judgment." Id. at 1090-91(internal citations surveying case law omitted). The Court went on to state:

> In general, because it is the mandatory duty of law enforcement agents to enforce the law, decisions as to how to best fulfill that duty are protected by the discretionary function exception....[The agent is] required to consider his training, the need to restrain [the

17

> arrestee], the concern for [the arrestee's] safety, the public's safety, his available resources, and the information at hand in determining the proper course of action. All of these factors indicate that the decision regarding how to best effectuate an arrest warrant is "fundamentally rooted in policy considerations, and that judicial second-guessing of this decision thus is not appropriate.

Id. at 1091(quoting Williams v. United States, 314 Fed.Appx. 253, 257-58 (11th Cir. 2009)(unpub. per curiuam)(quoting Mesa v. United States, 123 F.3d 1435, 1438 (11th Cir. 1997)).

Plaintiff argues that Hart does not control the outcome here because Hart related to an arrest, and not a prisoner transport. This is a distinction without a difference. The same policy considerations applicable in Hart, are applicable here: balancing of competing interest such as the need to restrain, the concern for the arrestee's safety, the public's safety, the available resources and all other information at hand.

Ranger Huston's decisions regarding how to inspect his vehicle, whether to employ the child safety locks, and which law enforcement personnel should drive his vehicle were certainly grounded in public safety, economic, or other public policy. Plaintiff has failed to rebut the presumption that Ranger Huston's discretion was grounded in public policy.

## **CONCLUSION**

Based on the foregoing discussion, the discretionary function exception removes this Court's jurisdiction. This Court respectfully recommends granting the defendant's 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

DATED this 31st day of August, 2015.

BY THE COURT:

_____
DANETA WOLLMANN
United States Magistrate Judge